**HOUSING WORKS, INC., Plaintiff,**

v.

**CITY OF NEW YORK; New York City Department of Homeless Services(DHS); Martin Oesterreich, Commissioner of DHS; Susan Wiviott, Associate Commissioner of DHS; John/Jane Does # 1–10; United States Department of Housing and Urban Development (HUD); and Andrew Cuomo, Secretary of HUD, Defendants.**

**No. 99 Civ. 8975(AGS).**

United States District Court,
S.D. New York.

Nov. 12, 1999.

Matthew D. Brinckerhoff, David H. Gans, Emery, Cuti, Brinckerhoff & Abady, P.C., New York, NY, for Plaintiff.

Naomi Sheiner and Robert Bailey, Asst. Corp. Counsel, New York, NY, for Defendants.

## OPINION AND ORDER

SCHWARTZ, District Judge.

Plaintiff Housing Works, Inc. ("plaintiff" or "Housing Works") filed this action seeking injunctive and declaratory relief. Plaintiff asserts claims under 42 U.S.C. § 1983, alleging that it has been deprived of its rights to freedom of speech and equal protection guaranteed by the First and Fourteenth Amendments to the U.S. Constitution. Plaintiff also asserts claims pursuant to Article I, §§ 8, 9, 11 of the New York State Constitution and challenges New York State administrative law. This matter is now before the Court on plaintiff's motion for a preliminary injunction directing defendants (i) to reinstate plaintiff's original rankings in defendants' ranking of the 1999 applications for U.S. Department of Housing and Urban Development ("HUD") funding, and (ii) to transmit the reinstated ranking to HUD before the close of the application deadline for next fiscal year. Defendants cross-move the Court to abstain from proceeding with this action. For the reasons set forth below, plaintiff's motion is GRANTED and defendants' cross-motion is DENIED.

## I. FACTS

The facts below are undisputed except where otherwise indicated.

**A. History of tension between Housing Works and the Giuliani Administration:**

Housing Works is a not-for-profit corporation that operates two supportive housing programs in New York City. Defendants are the City of New York ("City"), the City's Department of Homeless Services ("DHS"), DHS Commissioner Martin Oesterreich ("Oesterreich"), former DHS Associate Commissioner for Policy and Planning Susan Wiviott ("Wiviott"), and DHS employee Sheila Sawyer ("Sawyer") who is one of the Jane Does, (Sawyer Aff. ¶ 3), (collectively: "defendants").

Housing Works, begun in 1991, provides housing and other services for homeless "persons with AIDS and HIV" ("PWAs"). (Decl. of Charles King, dated Oct. 6, 1999 ("King Decl."), ¶¶ 2, 23.) Plaintiff's clients are not only PWAs but individuals who are also mentally ill, emotionally disturbed, financially needy, or chemically dependent, including individuals with such problems who were rejected by other providers. (King Decl. ¶ 3.) Housing Works has a history of criticizing what it perceives as the indifference to PWAs of the administration of Mayor Rudolph Giuliani. It concedes that it has disrupted a Town Meeting, engaged in civil disobedience in the entrance of the mayor's office, taken over the Division of AIDS Services offices, disrupted HIV Planning Council meetings and engaged in other similar conduct, some of which is referred to below. (King Decl. ¶ 59 n. 10.)

In 1994, Housing Works vigorously opposed plans to abolish the City's Division of Aids Services ("DAS") (now known as: Division of Aids Services and Income Support or "DASIS"). (King Decl. ¶ 19.) Housing Works particularly criticized then Deputy Mayor Fran Reiter ("Reiter"), in a series of demonstrations. (King Decl. ¶ 20.) Housing Works' representatives, accompanied by a TV crew, entered a meeting that plaintiff alleged had been convened for the purpose of abolishing DAS, and began to read on camera from a document that plaintiff refers to as Reiter's "secret" agenda. As quoted in the *New York Times* of December 15, 1994, Reiter responded by decrying Housing Works' "non-negotiable demands and grandstanding" that had engendered "unproductive, time wasting meetings". (King Decl. ¶ 21; *Id.* at Ex. B.) The Administration ultimately did not abolish DAS. (King Decl. ¶ 22.)

Housing Works organized the "This City Is Ours" rush-hour demonstration against the mayor on April 25, 1995, blocking four bridges and tunnels. (King Decl. ¶ 59 n. 10.) Later, Housing Works commenced an action challenging the benefits provided to PWAs by the City, *Henrietta D. v. Giuliani*, No. 95 Civ. 0641(SJ), 1996 WL 633382, 21 A.D.D. 329 (E.D.N.Y. Oct. 25, 1996) (seeking to force Human Resources Administration to provide better benefits). (*See* King Decl. ¶ 15.).

In March of 1997, Charles King ("King"), co-executive director of Housing Works, attended a meeting between the City's Human Resources Administration ("HRA") and Housing Works concerning new contracts and contract renewals. (King Decl. ¶¶ 1, 32.) Housing Works alleges that HRA's then-Commissioner Lillian Barrios–Paoli ("Barrios–Paoli") (i) threatened Housing Works with retaliatory treatment if it continued to "cause trouble" by advocating on behalf of PWAs, (ii) asked Housing Works why it was so hostile to the Giuliani Administration, and (iii) advised that Housing Works could not expect favorable treatment with Housing Works' attitude. (King Decl. ¶ 33.). Pamela S. Brier ("Brier"), Chair of the Board of Directors of Housing Works, also attended the March 1997 meeting and corroborates King's version. (Affidavit of Pamela S. Brier, dated April 2, 1998, attached to King Decl. as Ex. I ("Brier Aff."), ¶¶ 1–4.)

Brier advised King to keep a low profile, which he did until October 22, 1997, when Housing Works publicly demonstrated

against what it perceived as the City's unfairness in not entering into certain contracts with Housing Works. (Brier Aff. ¶¶ 6–7.) King was arrested along with 37 others after what Housing Works alleges was a "peaceful demonstration" at the offices of HRA and at Mayor Giuliani's re-election headquarters. (King Decl. ¶¶ 36, 59 n. 10.) The same day, HRA issued a press release stating that it would not renew Housing Works' contracts totaling approximately $ 4.5 million and would no longer enter into contracts with Housing Works relating to Housing Works ongoing projects. (King Decl. ¶¶ 37, 46.)

In September 1997, approximately one month prior to HRA's press release referred to above, Lou–Ellen Barkan ("Barkan"), then Chief of Staff for Deputy Mayor Randy Mastro ("Mastro"), discussed Housing Works with a City employee (whose name she cannot recall). (King Decl. ¶ 40.) The first entry in Barkan's two pages of notes on that discussion is: "Housing Works (*Fran Hates them* )", referring to Fran Reiter, and below that: "Act-up" and "AIDS advocacy". (King Decl. ¶ 40 (emphasis in original); Ex. J att. to King Decl.) Defendants note that City officials who were considering the contracts with Housing Works have denied that Reiter played any role in the Administrations' decisions as to the contracts. (Bailey Aff. in Opp. to Applications for Preliminary Injunctions ¶ 179, submitted to state court. ("Bailey State Aff."))

The hand-written notes of Beth Kaswan ("Kaswan"), the City's Chief Procurement Officer and of the head of the Mayor's Office of Contracts ("MOC"), and of MOC staffer Jeffrey Weinstein ("Weinstein"), certain of which were prepared prior to October 22, 1997, the date of the press release, refer to the City's concern that Housing Works might embark on another demonstration or protest. (King Decl. ¶ 41; Ex. K.L att to King Decl.) Weinstein wrote, on October 7, 1997, "Doing nothing will force HWks to do something—going public". (King Decl. ¶ 42 n. 6; Ex. L. at 3,

att to King Decl.) Both Kasman and Weinstein referred in their notes dated October 20, 1997 to a strong rumor that Housing Works would protest at City Hall, with Kasman adding that Mastro "needs a report on all they (HW) did wrong" and that Mastro had told Barrios–Paoli that she "must be prepared to respond on camera tomorrow". (King Decl. ¶ 43, 44; Ex. K at 11; Ex L at 5.) Kasman's notes dated October 21, 1997 bracket news of an imminent protest together with a reference to a meeting with David Klasfeld ("Klasfeld"), then on Mastro's staff. (King Decl. ¶ 45; Ex. K at 13.) Kasman's hand written notes also refer to Housing Works' demonstrations or marches that she had heard of from Richard Bonamarte, HRA's Chief Contracting Officer, from Gerard Hoey, HRA's Inspector General at the Department of Investigation, and from Barkan. (King Decl. ¶ 41 n. 5.)

On October 29, 1997, in a meeting with Barkan following the demonstration, Kasman wrote "Housing Works broke into campaign headquarters & chained themselves to desks". (King Decl. ¶ 47; Ex. K at 13.) Weinstein, attending the MOC meeting over which Kasman presided, wrote "This a.m. chained themselves to desks at mayor's campaign headquarters". (King Decl. ¶ 48; Ex. L at 11.)

In November 1997, Housing Works commenced an action in state court entitled *Housing Works, Inc. v. City of New York,* 680 N.Y.S.2d 487, 255 A.D.2d 209 (N.Y.App.Div.1998), challenging the non-renewal and termination of Housing Works contracts for the provision of supportive services to PWAs. (King Decl. ¶¶ 15, 49.)

In March 1998, Housing Works obtained and released to reporters a copy of a report commissioned by the Mayor's Office of AIDS Policy that was highly critical of HRA. The *New York Times,* on March 12, 1998, called the report "nightmarish", and summed it up by stating that HRA had permitted PWAs to be housed in hotels where "criminal activity is rampant", citing

"drug dealing, prostitution and extortion", with the full knowledge of some City workers. (Ex. O attached to King Decl.; King Decl. ¶¶ 18, 61.) The report received wide circulation in the media, and Mayor Giuliani was quoted as saying it was "a very very false picture ... for the purposes of getting attention for themselves". The mayor's press secretary was quoted as saying that Housing Works was seeking to promote "their own biased political agenda." (Ex. O attached to King Decl.)

Thereafter, Housing Works commenced an action in this Court, *Housing Works v. Safir*, No. 98 Civ. 4994(HB), 1998 WL 409701 (S.D.N.Y., Jul. 21, 1998), against Howard Safir, Commissioner of the New York City Police Department, the City of New York, and May or Giuliani. In July 1998, a preliminary injunction was granted enjoining the defendants from enforcing a policy of the New York City Police Department limiting the size of groups conducting press conferences on the steps of City Hall to 25 people. Following issuance of the injunction, Housing Works held a press conference on the steps of City Hall. (King Decl. ¶ 15.) At the press conference Housing Works protested the City's violations of Local Law 49, which codified the existence of the Division of AIDS Services and mandated the availability of certain services to persons afflicted with AIDS. (King Decl. ¶ 58.) A report setting out the violations asserted that thousands of potential beneficiaries were unaware of their eligibility for benefits because the City had failed to properly publicize such eligibility. (King Decl. ¶ 58.) Housing Works protesters carried placards of Mayor Giuliani stamped "AIDS Criminal", in blood red. (King Decl. ¶ 58.)

In November 1998, Mayor Giuliani left a press conference when asked about Housing Works, grimacing and throwing his hands up in disgust; the event was filmed and broadcast on the nightly news. (King Decl. ¶¶ 16, 60.) In November 1998, as Housing Works prepared to stage the protest at City Hall referred to in *Safir*, a widely-publicized vigil organized to "Tell the Mayor: People with AIDS are dying", the mayor took security measures, claiming that Housing Works was a "suspect organization". (King Decl. ¶¶ 16, 60; Ex. A attached to King Decl.)

In December of the same year, Housing Works staged another City Hall protest, in commemoration of World AIDS Day, carrying banners and reading aloud the names of persons who had died of AIDS. Housing Works had sought and secured injunctive relief in *Housing Works, Inc. v. Safir*, No. 98 Civ. 4994(HB), 1998 WL 823614 (S.D.N.Y., Nov.25, 1998), to permit Housing Works, on the steps of City Hall, to commemorate World Aids Day and to criticize Mayor Giuliani's alleged indifference. (King Decl. ¶ 15.)

During the period of successive demonstrations in late 1998, Housing Works applied for a "Welfare–to–Work" contract, a contract to provide job training for public assistance recipients with HIV/AIDS, in response to an October 1998 solicitation by the State Department of Labor ("SDOL") and State Department of Health ("SDOH"). (Turner Aff. ¶ 4.) The proposal required a written approval by the local social services district, which for Housing Works meant HRA approval. (King Decl. ¶ 86.) HRA added "affirmative approvals" to all proposals submitted to it en route to SDOL, but for three proposals, one of which was Housing Works'. (Turner Aff. ¶ 7; Ex. 6 att. to Bailey Decl.) Those three proposals were awarded merely "form letters of certification". (Turner Aff. ¶ 7; Ex. 6 att. to Bailey Decl.) HRA's certification of Housing Works as a potential service provider was submitted to the State in December 1998. (King Decl. ¶ 86.)

King alleges that on or about February or March 1999, he was informed that Housing Works was the highest ranked bidder. (King Decl. ¶ 87.)

On February 23, 1999, HRA Commissioner Turner sent a letter to the State Commissioner of Labor "withdrawing its

'Certification Form for the State of New York Department of Labor HIV Welfare–to–Work Request for Proprosals'" with respect to the proposals submitted by three agencies, including Housing Works. (Ex. 6 att. King Decl., letter from Turner to SDOL dated Feb. 23, 1999). Turner's explanation for the withdrawal was that the certification had been provided with a view to "allow[ing] the selection committee as broad a review as possible", and that he had thought HRA would later have another chance to comment, this time on the proposals already deemed reviewable, but had been apprised a month earlier that HRA would not be on the final selection committee. (Ex. 6 att. King Decl., letter from Tuner to SDOL dated Feb. 23, 1999). Housing Works disputes this rationale for the withdrawal, asserting that the letter was sent because Housing Works was going to be awarded the contract. (King Decl. ¶ 88.) Turner's letter conclusively stated that all three proposals were "nonresponsive . . . to the goals of HRA's Division of Aids Services and Income Support regarding private sector job development, preparation and placement." (Ex. 6 att. Bailey Decl., Letter of Turner, Feb 23, 1999). The letter detailed Housing Works' history: the March 17, 1998 DOI report, a September 4, 1998 nonresponsibility determination, and a November 18, 1998 Appellate Division decision in *Housing Works v. City of New York.* (Ex. 6 att. Bailey Decl., Letter of Turner, Feb 23, 1999). The letter did not detail the history of the other two programs. (Ex. 6 att. Bailey Decl., Letter of Turner, Feb 23, 1999).

Thereafter, Turner met with Karen Papendrea of SDOL and Humberto Cruz ("Cruz") of SDOH, allegedly in order "to clarify the reasons for HRA's decertification of Housing Works as a potential vendor". (Turner Aff. ¶¶ 6, 7.) Housing Works submits that the Turner meeting was called in order to prevent Housing Works from being awarded the job contract. (King Decl. ¶ 89.)

Turner stated that it would be irresponsible for HRA to approve distribution of funds to Housing Works in light of the audits and the fact that HRA had not recovered the misallocated funds, especially since City monies would provide significant funding for the state job training contract. (Turner Aff. ¶¶ 6, 7; King Decl. ¶ 89.) Moreover, Turner told SDOL that if Housing Works received SDOL funds, HRA would neither refer clients to Housing Works' programs nor approve Housing Works' billing for services rendered to clients who approached it on their own. (Turner Aff. ¶ 8.)

At the meeting, the State suggested that a third nonprofit organization would handle all financial and accounting aspects of the contract in order to alleviate any concerns as to Housing Works' financial responsibility, and that Turner rejected the proposal. (King Decl. ¶¶ 89, 90. Cruz transc.) At the meeting Turner also threatened to refuse to certify Housing Works as a Welfare–to–Work site, with the alleged result that Housing Works' clients would be precluded from participating in Housing Works' job training even if Housing Works did receive the contract. (King Decl. ¶ 92; Cruz transc.) Housing Works was not awarded the job training contract. (Cruz trans.)

### B. Housing Works' Financial History

Defendants contend, in substance, that the City's response to Housing Works traces, not to the latter's public statements and demonstrations, but to its troubled financial history. Housing Works, in response, submits the following.

By late 1995 and early 1996 it had become clear to Housing Works, a burgeoning organization, that its accounting system had become inadequate. (King Decl. ¶ 23.) Housing Works' management personnel were not being timely updated on Housing Works' financial status. (King Decl. ¶ 24.) Cash flow mired and Housing Works was unable to meet payroll or make timely payments to creditors. (King Decl.

¶ 24.) Housing Works alleges that the type of financial problems detailed are not unusual for non-profits providing these kinds of services, and that others experienced the same difficulties with HRA, and that only Housing Works was singled out for punitive treatment. (King Decl. ¶ 38.)

Housing Works avers that it immediately informed HRA of its financial and accounting problems and worked with HRA and accounting firms Ernst & Young and Peat, Marwick, & Mitchell in early 1996 to produce a corrective action plan. (King Decl. ¶ 25.)

The City's Department of Investigation ("DOI") examined Housing Works' books and concluded in July 1996 that Housing Works' record keeping was inadequate, that funds had been commingled, that separate bank accounts had not been maintained, that there were unexplained fund transfers to other companies, and that a full scale audit should be performed. (King Decl. ¶ 26; Ex. C att to King Decl.)

The DOI report also faulted Housing Works for the fraudulent endorsement of checks by a Housing Works employee.[1] Housing Works alleges that as soon as Housing Works had discovered the misconduct in 1993, it retained a certified public accountant to review accounts and to clarify what had occurred and that Housing Works reported the matter to the New York County District Attorney's Office ("DA's Office"). (King Decl. ¶ 26 n. 2.) Housing Works alleges that as soon as the DA's Office permitted plaintiff to advise HRA, i.e., July 1995, plaintiff did so, enclosing a reimbursement for $ 5495.00, the total amount of misappropriated funds owed to HRA. (King Decl. ¶ 26 n. 2; Ex. E att. King Decl.) Later, in 1996, plaintiff provided the DOI investigator with all the supporting documentation. (King Decl. ¶ 26 n. 2.) Housing Works alleges that it made the City whole even though Housing Works had itself suffered a loss in excess of $100,000 as a result of the fraud. (King Decl. ¶ 26 n. 2.)

On December 12, 1996, John Dereszewski, Director of Contract Services for DASIS, wrote in a memorandum:

> In my view, Housing Works has made sufficient progress in recovering from the fiscal crisis it experienced at the beginning of this year to warrant our support for this venture.

(Ex. D, att. to King Decl.)

An HRA memo to MOC in August 1997 dismissed the possibility of "an alternate responsible vendor to provide housing to the DAS clients currently being served by Housing Works" on the grounds that "the fiscal reforms were reviewed satisfactorily by HRA fiscal program and MIS staff, and have significantly improved Housing Works' ability to control its fiscal operations." (King Decl. ¶ 27 & n. 3; Ex. E att. to King Decl.)

In January 1997, Gregory Caldwell ("Caldwell") became Deputy Commissioner of HRA in charge of DASIS and learned of the 1996 DOI report. (*See* King Decl. ¶ 28.) Caldwell had worked for Reiter from 1994 to 1997, during the period when Reiter had left to oversee Mayor Giuliani's reelection campaign, and Reiter had helped Caldwell get his job at HRA. (*See* King Decl. ¶ 29.) It is alleged that when Caldwell consulted Reiter concerning the report, she advised Caldwell to audit Housing Works. (King Decl. ¶¶ 30–31.) An audit was conducted by Jack Hiralall, P.C. (King Decl. ¶¶ 52.)

On October 22, 1997, HRA issued a press release stating that it refused to enter into any contracts with Housing Works. On November 7, 1997, Housing

---

1. Housing Works alleges that HRA and the City satisfied themselves that this matter was a non-issue. (King Decl. ¶ 26 n. 2; Exs. C, D att. to King Decl.) Notwithstanding, Housing Works contends that this fraud has been repeatedly relied upon by the City for its ac-

tions, cropping up most recently in the Appellate Division's reversal of a preliminary injunction granted in the state case, *Housing Works, Inc. v. City of New York,* 680 N.Y.S.2d 487, 255 A.D.2d 209 (N.Y.App.Div.1998). (King Decl. ¶ 26 n. 2.)

Works filed suit in state court in *Housing Works, Inc. v. City of New York*, 680 N.Y.S.2d 487, 255 A.D.2d 209 (N.Y.App. Div.1998), see discussion *supra* Part A.

A second DOI report was issued on March 17, 1998, criticizing Housing Works's poor record-keeping and its commingling of funds, problems that Housing Works alleges had been resolved to HRA's satisfaction in 1996. (King Decl. ¶¶ 38, 50 & n. 7; Ex. M att. to King Decl.) Plaintiff alleges that this DOI report purported to be the result of a new investigation but reviewed the same calendar years of 1995 and 1996 and the same issues as did the 1996 DOI report issued in the aftermath of Housing Works' financial crisis. (King Decl. ¶¶ 50, 51.) The 1996 DOI report did address the same issues but related only to calendar year 1995. (Ex. C, att. King Decl.) The two DOI reports draw the same conclusions. (King Decl. ¶ 51.) Housing Works alleges that the funds that came from HRA constituted a reimbursement of monies due Housing Works. (King Decl. ¶ 50 n. 7.) The second DOI report clearly disagrees with plaintiff's claims in this regard. (Ex. M att. King Decl.)

On March 18, 1998, HRA informed plaintiff that based on the second DOI report and the Hiralall audit, it was considering issuing a finding that Housing Works was "non-responsible". (King Decl. ¶ 52.) On June 3, 1998, HRA determined Housing Works to be a "non-responsible" bidder. Housing Works appealed this determination to the new Commissioner of HRA, Jason Turner. (King Decl. ¶ 53.) The finding was affirmed by Commissioner Turner on September 4, 1998. (King Decl. ¶ 54.)

Housing Works appealed HRA's final determination to Mayor Giuliani on September 14, 1998. (King Decl. ¶ 54.) Housing Works has received no ruling on the appeal from the mayor, although more than a year has elapsed. Mayor Giuliani has failed to rule despite the rule that "a prompt written decision with respect to the merits of the bidder's appeal" is re-quired. *New York City, N.Y., Rules* § 7–03(e)(4) (1998).

Housing Works contends that the mayor's failure to rule has effectively foreclosed Housing Works from challenging the finding in court. (King Decl. ¶ 54; Ex. V att. to King Decl.)

## C. HUD funding

### 1. HUD's past funding for two of Housing Works' programs

Housing Works operates, *inter alia*, two permanent supportive housing projects, the East Ninth Street program in lower Manhattan, and the East New York program, in East New York, Brooklyn. (King Decl. ¶ 8.) Residents of both programs are individuals with chemical dependency or are afflicted with mental illness. (King Decl. ¶ 10.) As residents, they enjoy privacy and independence, programs to develop living skills, comprehensive health care, health education, employment opportunities, employment skills training, the opportunity to model themselves after their Resident Aides (successful graduates of the job program) and the opportunity to help regulate their own program through the "Residents' Council". (King Decl. ¶ 11.)

Financial assistance to construct and implement these two programs derived in part from $3.9 million in HUD assistance. (King Decl. ¶ 9.) Housing Works received $1.9 million in 1995, and another $1 million for its East Ninth Street residence in 1996, from HUD's Supportive Housing Program. (King Decl. ¶ 12; Wiviott Decl. ¶ 17.) The Supportive Housing Program is one of three HUD sponsored funding programs under the Continuum of Care Homeless Assistance Programs ("COCHAP"). (King Decl. ¶ 12; Wiviott Decl. ¶ 6.) Wiviott points out that Housing Works received funding at this time, although Housing Works had already begun staging protests on behalf of PWAs against the Giuliani Administration. (Wiviott Aff. ¶ 17.)

Both programs fulfilled Housing Works' goals as contracted to HUD: to assist the

homeless to remain in permanent housing, to increase life skills, and to have greater self-determination in medical treatment. (King Decl. ¶ 13.)

Without additional HUD funds, it is alleged that the East Ninth Street site will lack 50% of required annual revenue and the East New York program will be denied nearly 70% of required annual revenue. (King Decl. ¶ 14.) Housing Works as a whole currently operates at a loss as a result, it is alleged, of the Giuliani Administration's refusal to contract with Housing Works. The loss of HUD funds, it is alleged, would be devastating to the two programs. (King Decl. ¶ 14.)

## 2. The application process for the Supportive Housing Program

HUD's application process with regard to projects benefiting the City's homeless is known as the "Super Notice of Funding Availability ("SuperNOFA" or "HUD NOFA") process. (Declaration of Susan Wiviott, signed Oct. 12, 1999 ("Wiviott Decl.") ¶ 3.) Under SuperNOFA, HUD utilizes a community-based approach known as the Continuum of Care, whereby each locality develops a plan for meeting the needs of its homeless population, and submits to HUD the locality's applications for federal funding from COCHAP that best meet those needs. (Wiviott Decl. ¶ 3.)

The Continuum of Care in New York City is implemented by The Way Home Coalition ("Coalition"), a partnership of non-profit community based homeless service providers, city agencies, and state agencies, that provide services to the City's homeless. (Wiviott Decl. ¶ 4.) One of those city agencies is DHS, which provides a range of services to the City's homeless population. (Wiviott Decl. ¶¶ 2, 4.) The Coalition has a Steering Committee, comprised of a DHS representative and representatives of eight other member organizations, to develop policy, establish priorities, and identify gaps in City ser-

vices already provided to the homeless, in order to design an effective Continuum of Care plan. (Wiviott Decl. ¶ 4.) The Steering Committee designated the following four categories of programs as high-priority: renewals and providers of services to drug addicts, to the mentally disabled, and to persons with AIDS. (Wiviott Decl. ¶ 28.) Housing Works asserts that as a renewal program serving a specialized population of PWAs, it is a high priority program four times over. (Wiviott Decl. ¶ 28.) Wiviott disagrees, asserting that, in an attempt to fill an existing gap in services, the latter three are priority categories applicable to new programs only. (Wiviott Decl. ¶ 28.) The Steering Committee has designated DHS to oversee and coordinate the City's HUD NOFA application. (Wiviott Decl. ¶ 4.)

One of Wiviott's responsibilities as DHS Associate Commissioner of Policy and Planning, a position she held from September 1994 to September 8, 1999,[2] was to oversee the annual application process and report directly to the DHS Commissioner. (Wiviott Decl. ¶¶ 1,5.) Day-to-day supervision of the HUD NOFA application process was executed by Sawyer, the DHS employee who reported directly to Wiviott. Sawyer has been Senior Policy Analyst since November 1996. (Wiviott Decl. ¶ 5; Sawyer Aff. ¶ 1.) It was Wiviott who was the DHS representative on the Coalition's Steering Committee. (Wiviott Decl. ¶ 5.)

DHS oversees COCHAP's Supportive Housing Program; the other two CO-CHAP programs are reviewed by the New York City Department of Housing, Preservation and Development ("HPD"), which submits them to DHS only for final inclusion to HUD. (Wiviott Decl. ¶ 7.) DHS sends a pre-application form to those past recipients and new organizations intending to apply and also, with the help of DHS consultant Howard Burchman ("Burchman"), supplies technical assistance for

**2.** Since September 8, 1999, Wiviott has been Associate Executive Director for Planning of

the Jewish Board of Family and Children's Services. (Wiviott Decl. ¶ 5.)

questions concerning pre-application. (Wiviott Decl. ¶ 8.) Two people chosen by DHS evaluate and score each completed pre-application it receives, and if the project is applying for renewal, one evaluator also usually visits the site. (Wiviott Decl. ¶ 9.) The scoring form evolved over the last "four or five years"; the scoring form for renewal programs was developed by Sawyer under Wiviott's supervision. (Wiviott Decl. ¶ 9.) HUD requires that all projects proposed for funding in the Continuum of Care plan be given a numerical rank from highest to lowest, but does not suggest a method for ranking. (Wiviott Decl. ¶ 11.) In New York City, ranking is accomplished by Wiviott and Sawyer, and by the Commissioner, who approves the ranking. (Wiviott Decl. ¶ 11; Sawyer Aff. ¶ 3.) They take into account: scorer evaluations, density of geographic distribution of programs per borough, failure to spend a previous HUD grant, and program-type. (Wiviott Decl. ¶ 11.)

The ranking is inserted into the Narrative, which is a HUD mandated description of the locality's Continuum of Care plan and was prepared for New York City in 1999 by Burchman, Wiviott, Sawyer, and the Steering Committee. (Wiviott Decl. ¶ 10.) The Narrative is inserted into an application form, as HUD mandates, and DHS provides ranked applicants with applications to complete and to submit directly to HUD. (Wiviott Decl. ¶¶ 10,11.)

The rankings are important because the HUD allocation is disbursed to the projects in order of rank in accordance with each project's requirements, until the money runs out. It is also a fact that HUD has in the past awarded additional sums beyond its anticipated allocation. (Sawyer Aff. ¶ 3.) Because the HUD allocation for 1999 is known to be $54 million, and projects ranking 1 through 56 in the 1999 applications have requested an aggregate of $53,918, 674, a ranking this year lower than 56 effectively forecloses receipt of HUD funds. (King Decl. ¶ 66.)

Oesterreich asserts that directing that plaintiff be ranked lower than the anticipated aggregate HUD allocation was an effective way to ensure that DHS would not be in the position of recommending funding for Housing Works' programs. (Oesterreich Aff. ¶ 8.) Sawyer avers that because of HUD's past practice of awarding additional sums, even projects ranked below 56 this year will probably not be foreclosed from receiving COCHAP funding. (Sawyer Aff. ¶ 13.)

### 3. Housing Works' application for HUD funding in 1999

On April 12, 1999, Housing Works submitted its application to the City. (King Decl. ¶ 63, 64.) Sawyer, the DHS official responsible for the SuperNOFA process, asserts that she "thought that both of Housing Works' programs looked good during [her] site visits, and [she] had no major problems with their pre-applications." (Sawyer Aff. ¶ 6.) At the hearing she testified that both projects were "excellent" and "high quality". She further testified that, in all material respects, the projects "met or exceeded HUD goals.". She noted that prior to her evaluations Housing Works had lost funding from DASIS. She gave the East 9th Residence a score of 80/90 and the East New York residence a 77/90. (Sawyer Aff. ¶ 6.) When Sawyer scored plaintiff's pre-application, Housing Works received a score that would have translated into ranks of 30th and 33rd with regard to the two subject programs. (King Decl. ¶ 70.)

Oesterreich, the newly appointed DHS Commissioner, testified that he ordered that Vendex reports be reviewed for all bidders, and thereafter the Vendex report for Housing Works disclosed that plaintiff had been found to be "non-responsible". He, therefore, directed that Housing Works' programs be ranked low enough to ensure that DHS would not be in the position of recommending funding for Housing Works' programs. (Oesterreich Aff. ¶ 8.) He states that no official instruct-

ed him to rerank plaintiff's projects. (Oesterreich Aff. ¶ 11.) Wiviott, in turn, directed Sawyer to rank Housing Works' projects lower than 56th but not consecutively. (King Decl. ¶¶ 71, 72; Sawyer Aff. ¶ 7.) Sawyer thereupon ranked plaintiff's projects 57th and 60th respectively, predetermining the scores Housing Works should be given in order to justify that ranking. (King Decl. ¶ 73.)

On May 21, 1999, when DHS released the rankings of the 71 projects, Housing Works' two projects were ranked 57th and 60th. (King Decl. ¶ 65.) Of the 35 projects seeking renewal, plaintiff's was last; the next lowest was 44th, and the top 40 were almost all renewals. (King Decl. ¶ 67.)

The reason for Oesterreich's order changing plaintiff's scoring is in dispute.

All three individual defendants assert that they have no animus toward Housing Works. (Oesterreich Aff ¶ 11; Wiviott Decl. ¶ 16; Sawyer Aff. ¶ 3.) King agrees that Sawyer bears no animus. (King Dep., City Ex. 7 at 153.) Oesterreich has "no particular recollection" that he heard of any of Housing Works' activities, though Wiviott and Sawyer were "aware" of Housing Works' critical views through the media. (Oesterreich Aff ¶ 11; Wiviott Decl. ¶ 16; Sawyer Aff. ¶ 3.) Wiviott adds that many of the organizations DHS deals with are critical of the Giuliani Administration. (Wiviott Decl. ¶ 16.) Defendants dispute plaintiff's assertion that animus motivated the reranking and assert that they downgraded Housing Works because of the Vendex warning that plaintiff was a nonresponsible bidder.

Plaintiff's Vendex record reveals that HRA had determined that Housing Works is a "non-responsible" bidder.[3] (Oesterr-

eich Aff. ¶ 7.) The Vendex database is the prime source for a City official's information on the prior performance and reliability of an entity seeking to contract with the City. (Oesterreich Aff. ¶ 3.) Osterreich and Sawyer did not testify to having seen Vendex reports at the time of the ranking, only Wiviott did. (King Decl. ¶ 77; Wiviott Decl. ¶ 21.) Oesterreich asserts that by mid-April defendants had not yet examined the Vendex database, relying instead on personal experience and the applicants' own representations. (Oesterreich Aff. ¶ 6.) Oesterreich then gave orders to search the Vendex database, but it was Wiviott who was conversant with HUD NOFA and who reported to him on the Vendex findings. (Oesterreich Aff. ¶¶ 5, 7.) Sawyer, too, asserts that it was Wiviott who told her that the Vendex information was negative. (Sawyer Aff. ¶ 3.) Even Wiviott, however, knew only that a financial problem of Housing Works' had resulted in the termination of an HRA contract, but knew no details of that allegation: i.e., its substance, when it occurred, how much money was involved, what remedies Housing Works had undertaken. (King Decl. ¶ 79; Wiviott Decl. ¶ 22.) The Vendex warning simply "confirmed accounts [Wiviott] had previously read in the paper". (Wiviott Decl. ¶ 22.)

Moreover, notwithstanding Oesterreich's testimony that he ordered a Vendex check, defendants did not generate Vendex reports for 57 of 95 applicants, any of whom, it is alleged, could also have been nonresponsible bidders. (King Decl. ¶ 77.) Also, Wiviott did not inform Oesterreich that Vendexes for several renewal applications ranked higher than plaintiff's had been submitted by entities as to which advice of caution warnings had been noted. (Wiviott Decl. ¶ 24.)[4]

---

**3.** The City Department of Health also made a determination of non-responsibility, dated July 15, 1998, but it is based on the same data used by HRA in its finding. (Oesterreich Aff. ¶ 10.)

**4.** Another renewal project, Banana Kelly, is alleged to have been the subject of an FBI investigation in May for alleged misappropriation of funds on a large scale, at the time of the reranking. (Oesterreich Aff ¶ 9; Sawyer Aff. ¶ 3.) The investigation into its alleged financial improprieties made headlines; de-

Oesterreich concedes that he had not, at the time of the ranking, reviewed the basis for plaintiff's "non responsibility" status, but asserts that he has since done so and would make the same decision concerning reranking of plaintiff. (Oesterreich Aff. ¶ 10.) Concerning the pending appeal of the non-responsibility determination, Oesterreich simply avers that he is familiar with the appeals process and that in the case of a successful appeal the Vendex database would either remove the finding of non responsibility or indicate that the finding of non-responsibility was no longer valid. (Oesterreich Aff. ¶ 4.) Oesterreich states that twenty years of experience [5] in City contracting has taught him that a "non-responsibility" determination on a Vendex is a form of "debarment", precluding any City contracts until the underlying problem is cured. (King Decl. ¶ 80.) Oesterreich explained that he did not need to analyze the basis for the non-responsibility determination (i)because his agency was not entering into the contract itself, merely a stewardship, and (ii)because a non-responsibility determination is not issued for minor reasons. (Oesterreich Aff ¶ 3, 6, 7.) Oesterreich submits that because there are other projects with no "non-responsible" status, it would be unfair to displace them with a questionable group. (Oesterreich Aff ¶ 8.) He states that DHS is acting as a steward for HUD money, and its credibility is on the line to ensure that the money is not squandered or spent irresponsibly. (Oesterreich Aff ¶¶ 3, 6.)

Plaintiff urges that a "non-responsibility" determination is never the basis for preclusion unless the agency concludes that the determination is material for the purposes of its own contract; non-responsibility for one agency may be wholly irrelevant to another. (King Decl. ¶ 82.)

Plaintiff cites City's Procurement Policy Board ("PPB") Rules, New York City, N.Y., Rules § 7–03 and 7–08, as interpreted by Bonamarte, Chief Contracting and Procurement Officer:

> [U]nder the PPB rules ... each agency must independently make a responsibility determination based on the fact pattern and how it affects their contract ... each responsibility determination is contract specific ... It kind of depends on the reasoning for the nonresponsibility determination .... agencies are required to look at that information, consider it with respect to the circumstances that affect their contract and then make an independent decision.

(King Decl. ¶ 82; Ex W,V attached to King Decl., at 16, 17, 19.)

Sawyer created new scoring sheets reflecting scores that were proportional to the downgrade in the ranking. Sawyer's scores for all the projects matched proportionately to the rankings she awarded. (Sawyer Aff. ¶¶ 8, 10.) Sawyer was not required to produce the original score sheet and contends that she could have disposed of it had she wished to conceal a motive. (Sawyer Aff. ¶ 12.) Sawyer adds that there was no reason to rescore Housing Works except for her own "compulsive neatness" and "desire to make scores match", because she could have ranked Housing Works lower regardless of its scores, given that HUD has no requirement that there be scores or that they match. (Sawyer Aff. ¶¶ 8, 9, 12.)

Housing Works argues that its ranking was the only one based on DHS' newly asserted right to rank an applicant where it chooses, instead of according to numeric scores reflecting the Coalition criteria, which was the process that DHS had com-

fendants assert that they were only made aware of the alleged misappropriation after the final rankings had been sent to HUD and it was too late to change the rankings. (Oesterreich Aff ¶ 9; Sawyer Aff. ¶ 3.) After Housing Works was downgraded, Banana Kelly emerged higher in rank.

5. Oesterreich started as a contract manager in the City's Department of Employment in 1974, rising to Deputy Commissioner of Operations in 1996, and was appointed to his present position at DHS in 1999.

municated to potential applicants and to HUD in the Narrative. (King Decl. ¶ 75.) The Narrative states: "All pre-applications are ranked and prioritized by DHS staff and other, relevant city agencies on the basis of criteria developed by the Coalition." (Ex. C attached to Decl. Charles King Supp. Housing Works Order to Show Cause for Expedited Discovery, dated August 17, 1999). HUD wrote to the mayor stating that "significant evidence exists to suggest" that City staff took "unilateral action to change priorities of at least two proposed projects ... [with] a history of adversarial relationships with the City" in contravention of New York City's Continuum of Care. (Ex. U attached to King Decl.)

Neither of DHS' two scoring sheets for plaintiff's programs refer to the Vendex report or to financial irregularities. (King Decl. ¶ 78; Sawyer Aff. ¶ 8.) Sawyer explains that the score sheets had no place for Vendex data to be entered, notwithstanding that she indicates that she did rely on the Vendex information to support the action she took. (King Decl. ¶ 73; Sawyer Aff. ¶¶ 8, 11.)

### D. Procedural history

Plaintiff filed this action on August 17, 1999, seeking preliminary and permanent injunctive relief, declaratory relief, attorneys fees, interest, and costs. The complaint asserts claims under 42 U.S.C. § 1983, alleging that plaintiff has been deprived of its rights to freedom of speech and equal protection under the First and Fourteenth Amendments to the U.S. Constitution. Plaintiff also asserts claims pursuant to Article I, §§ 8, 9, 11 of the New York State Constitution, and challenges the DHS administrative actions as arbitrary and capricious.

On August 19, 1999 plaintiff filed an Order to Show Cause, seeking a preliminary injunction and expedited discovery. Judge Chin, sitting in Part I, granted expedited discovery. On September 28, 1999, the Court issued a Stipulation and Order of Dismissal with respect to the federal defendants, dismissing the claims against them without prejudice. HUD has informed the Court that it will abide by the order of the Court with regard to the ranking of Housing Works' projects. This matter is now before the Court on plaintiff's motion for preliminary injunction. The City defendants cross-move the Court to abstain from proceeding with this action under the doctrine articulated by the Supreme Court in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). A hearing was held with respect to this motion on November 5, November 8, and November 9, 1999.

### E. Facts Underlying Motion to Abstain

The defendants' motion with regard to the issue of abstention directs the Court's attention to certain litigation in the state courts. The issue presented here is whether this Court should defer to the state court in which that litigation is proceeding. The relevant facts are set forth below.

On November 19, 1997, plaintiff Housing Works, along with three named plaintiffs of a proposed class of individuals with AIDS (the "State Court Plaintiffs"), commenced an action in state court against the City of New York ("City"). ("State Court Action"). *See Housing Works, Inc. v. City of New York*, 255 A.D.2d 209, 680 N.Y.S.2d 487 (1st Dep't 1998). (*See also* Amended Complaint in State Court Action, annexed as Exhibit 21 to Defendants' Notice of Cross–Motion ("State Court Compl.") ¶¶ 1, 2.) The State Court Action alleged that the City had induced Housing Works to continue to provide housing and services after the expiration date of its contract to provide the services, misleading Housing Works into believing that its contract would be extended and its expenditures reimbursed. *See Housing Works*, 680 N.Y.S.2d at 487. Housing Works further alleged that the City's actions were in retaliation for Housing Works' exercise of

its right to freedom of speech. *See Housing Works,* 680 N.Y.S.2d at 487. The State Court Plaintiffs characterized the State Court Action as one related to another action before Justice Emily Jane Goodman, and the action was assigned to Justice Goodman as a related case. (Affidavit of Bob Bailey ("Bailey Aff.") ¶ 20.) On November 20, 1997, Justice Goodman issued a temporary restraining order ("TRO"), ordering the City, *inter alia,* to pay the rents on the apartments of Housing Works' clients. (*See* Decision of Gangel–Jacob, J. dated September 25, 1999 in State Court Action ("Gangel–Jacob Order"), annexed as Exhibit 19 to Defendants' Notice of Cross–Motion, at 2.) On December 2, 1997, the City removed the action to federal court, and the case was assigned to Judge Mukasey. (*See* Gangel–Jacob Order at 3; Bailey Aff. ¶ 21.)

The parties thereafter stipulated to the dismissal of the federal claims with prejudice, and the matter was remanded back to state court. (*See* Gangel–Jacob Order at 2.) The State Court Plaintiffs have asserted that they agreed to drop their federal cause of action and remand the case back to state court because the City had complied with a "temporary food stamp restoration order entered by this court." (*See* Gangel–Jacob Order at 2.)

On January 20, 1998, the State Court Plaintiffs amended their complaint to allege a due process violation on the ground that the City's actions were a de facto bar to Housing Works' participation in City contract work, and Housing Works had not been granted notice and an opportunity to be heard. *See Housing Works,* 680 N.Y.S.2d at 487. However, the amended complaint does not assert causes of action under the federal constitution. (*See* State Court Compl.) Defendants in this action imply that the State Court Plaintiffs' actions in this regard were motivated by a desire that their case be before Justice Goodman. (Bailey Aff. ¶¶ 22, 23.)

The City appealed the stay issued by Justice Goodman and, on February 20, 1998, the Appellate Division vacated the TRO. (*See* Gangel–Jacob Order at 3.) Justice Goodman reinstated the TRO, and issued a permanent injunction on April 28, 1998. (*See* Gangel–Jacob Order at 3.) On November 19, 1998, the First Department reversed Justice Goodman's decision and vacated the preliminary injunction. *See Housing Works,* 680 N.Y.S.2d at 487. The Appellate Division also concluded that "[a]s the motion court improperly made numerous credibility determinations without holding a factual hearing … we believe the better course is to remand the action to a different Justice." *Id.* The State Court Action was eventually reassigned to Justice Gangel–Jacob.

On May 21, 1999 Housing Works submitted to the City a proposed Second Amended Complaint in the State Court Action, which added numerous federal constitutional claims. (Bailey Aff. ¶ 33.) The City informed Housing Works that it would not oppose the amendment. *Id.* Also on May 21, 1999, the City, through DHS, as set forth above, released its rankings of projects for HUD funding that placed Housing Works' projects at 57th and 60th respectively. (Affidavit of Charles King ("King Aff.") ¶ 65.)

On June 11, 1999, instead of filing their amended complaint, the State Court Plaintiffs moved to discontinue the State Court Action without prejudice, so that it could commence a new action in federal court. (*See* Gangel–Jacob Order at 4.) The State Court Plaintiffs asserted in support of their motion that (i) its case, having been converted to one for damages, would proceed more expeditiously in federal court; (ii) litigation expenses would be lower in federal court; (iii) discovery is broader in federal court; (iv) the federal court would provide greater deference to a jury determination. (*See* Gangel–Jacob Order at 4.) The City opposed the motion, arguing that the action had proceeded very far in state court, and that the State Court Plaintiffs were merely attempting to avoid the ef-

fects of the decision of the Appellate Division. (*Id.*)

On August 17, 1999, plaintiff filed this action alleging violations of federal law, including the First and Fourteenth Amendments to the United States Constitution, and seeking relief with respect to the City's rankings of its projects eligible for HUD funding. Defendants allege that plaintiff's strategy was to have this case litigated before Judge Baer, before whom related litigation was pending. (Bailey Aff. ¶ 35 n. 3.) Judge Baer declined to accept this action as related, and it was assigned to this Court.[6]

## II. MOTION TO ABSTAIN

█ It should be noted that federal courts have a " 'virtually unflagging obligation' to exercise their jurisdiction." *Burnett v. Physician's Online, Inc.*, 99 F.3d 72, 76 (2d Cir.1996) (citing *Colorado River*, 424 U.S. at 817, 96 S.Ct. 1236, 47 L.Ed.2d 483). However, various exceptions to this rule exist, including what has become known as the *Colorado River* abstention doctrine. A *Colorado River* abstention is considered in situations where both federal and state courts have exercised jurisdiction over a controversy, but should only be applied under "exceptional" circumstances. *See Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 818, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) ("the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention. The former circumstances, though exceptional, do nevertheless exist."). In particular, *Colorado River* abstention should not be applied unless the federal and state actions are truly "concurrent." *See Sheerbonnet, Ltd. v. American Express Bank Ltd.*, 17

F.3d 46, 49 (2d Cir.1994). In determining whether the actions are concurrent, a court may consider whether both actions involve the same (i) parties, (ii) subject matter, and (iii) relief requested. *See Sheerbonnet*, 17 F.3d at 49—50 (collecting cases; refusing to abstain because the actions were not truly concurrent).

█ If the actions are concurrent, a number of factors should be considered in determining whether *Colorado River* abstention is appropriate, including six factors discussed by the Second Circuit in *Burnett:*

(1) the assumption of jurisdiction by either court over any res or property,

(2) the inconvenience of the federal forum,

(3) the avoidance of piecemeal litigation, and

(4) the order in which jurisdiction was obtained [ ]

(5) whether state or federal law supplies the rule of decision, and

(6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

*Burnett*, 99 F.3d at 76. Additionally, "the balance should be heavily weighted in favor of the exercise of jurisdiction." *See Sheerbonnet*, 17 F.3d at 49 (citing *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).

### A. Whether the Two Actions Are Truly "Concurrent"

#### 1. Parties.

The State Court Action was filed as a class action, and, therefore, included a number of plaintiffs who are not parties to this action. Similarly, this action includes defendants who were not parties to the State Court Action, including officers of

---

**6.** On September 28, 1999, Justice Gangel–Jacob denied the State Court Plaintiffs' motion to discontinue. (*See* Gangel–Jacob Order at 8.) Justice Gangel–Jacob declined to make a finding as to the State Court Plaintiffs' motivation, denying the motion on the grounds that there would be substantial prejudice to the City. (*See* Gangel–Jacob Order at 5–8.)

DHS sued in their official capacities. Housing Works is the only plaintiff in this action.

Although the parties are similar in both actions, "[s]imilarity of parties is not the same as identity of parties." *See Sheerbonnet,* 17 F.3d at 50 (citing *Alliance of Am. Insurers v. Cuomo,* 854 F.2d 591, 603 (2d Cir.1988)).

### 2. Subject Matter.

The State Court Action dealt with specific contracts under which Housing Works provided services, and alleged tortious interference and retaliation relating to those contracts. This action, however, is limited to the issue of DHS' recommendations to HUD and the circumstances surrounding defendants' decision to alter the rankings of Housing Works' projects. The subject matter therefore, although overlapping, is not identical. *See Alliance of Am. Ins.,* 854 F.2d at 603 ("While there may be some overlap of subject matter, it is not sufficient to make these actions concurrent.")

One similarity between the actions, however, is that the City alleges the same non-discriminatory justification for the actions challenged in both actions-Housing Works' financial and accounting problems. Similarly, in both actions, Housing Works alleges that the non-responsibility rating given to them is a mere pretext for retaliatory action.

### 3. Relief Requested.

The State Court Action is two years old, and is not likely to involve extensive injunctive relief. This action, however, involves a request for immediate injunctive relief and an allegation that irreparable harm is about to occur. Therefore, the relief requested in both actions is not currently identical, although plaintiff could likely apply in the State Court Action to amend its complaint and for a preliminary injunction seeking the same relief as that requested in this action. On balance, it appears as if this action seeks significantly different relief from the State Court Action as it now exists.

### B. Application of Colorado River Factors.

#### 1. The assumption of jurisdiction by either court over any res or property.

There is no real property at issue in either litigation. *Colorado River* envisions that there is a problem when two courts attempt to assert jurisdiction over the same property. *See Colorado River,* 424 U.S. 800, 818, 96 S.Ct. 1236 (noting that "the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts.") This factor does not apply here, and therefore weakens the case for abstention.

#### 2. The inconvenience of the federal forum.

Litigating in this Court is not inconvenient for the defendants. Its location is virtually the same as the state court, and extremely close to the seat of City government. The City litigates in this district daily.

#### 3. The avoidance of piecemeal litigation

This action does have substantial overlap with the state court action. However, this action does involve a new dispute, which can be fairly easily separated from the disputes at issue in the State Court Action. There is no serious concern here that "inconsistent disposition of these claims between two concurrent forums would breed additional litigation," *see Arkwright-Boston Manufacturers Mutual Insurance Company v. City of New York,* 762 F.2d 205, 211 (2d Cir.1985), because this action will predominantly involve factual determinations as to whether defendants' actions were motivated by legitimate concerns about plaintiff's financial problems or by a desire to retaliate against protected behavior. The individuals in-

volved in the decisionmaking are different in both actions, and it is entirely possible that the City could be found to have retaliated with respect to the contracts at issue in the State Court Action, but not with respect to the HUD rankings in this action. It would, likely, have been more efficient if Housing Works chose to pursue the relief it now seeks in the State Court Action. However, this hardly amounts to an "exceptional circumstance" requiring the Court to abstain from exercising the jurisdiction granted to it by Congress.

### 4. The order in which jurisdiction was obtained

"[P]riority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone*, 460 U.S. at 21, 103 S.Ct. 927. Here, the State Court Action has been proceeding for two years and extensive discovery has been taken. Further, defendants allege that plaintiff's request for declaratory relief is intended so that a res judicata effect can be had with respect to the State Court Action. This factor does lend support to defendants' request for abstention.

### 5. Whether state or federal law supplies the rule of decision

As noted in *Moses H. Cone*, "the presence of federal-law issues must always be a major consideration weighing against surrender [of federal jurisdiction]." *See Moses H. Cone*, 460 U.S. at 26, 103 S.Ct. 927. Plaintiff asserts predominantly federal causes of action under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution. Although defendants note that plaintiff could have amended its complaint in the State Court Action to assert claims similar to the federal claims alleged in this action, "[t]he mere fact that a state court of general jurisdiction can entertain any claim between two parties properly before it is too insubstantial a basis for compel-

ling a party which wishes to bring federal constitutional claims in federal court to present those claims to a state court instead." *Brooklyn Institute*, 64 F.Supp.2d 184, 194. This factor therefore weighs strongly against abstention.

### 6. Whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction

While New York courts are capable and willing to enforce rights guaranteed to plaintiff under federal law, certain of the City's actions underlying this dispute suggest that federal jurisdiction is appropriate. In particular, the Court notes that the mayor has created a barrier to the state courts' consideration of an important issue in this case: whether HRA's finding that Housing Works was a non-responsible bidder should be upheld. As stated previously, although "a prompt written decision with respect to the merits of the bidder's appeal" is required, the Mayor has failed, for a period of 14 months, to act on plaintiff's appeal, effectively foreclosing Housing Works from litigating this issue in state court. *See New York City, N.Y., Rules* § 7–03(e)(4) (1998); King Decl. ¶ 54; Ex. V att. to King Decl. In determining whether this Court should defer to the state courts and abstain from proceeding with this action, this Court cannot ignore the conduct of defendants that have had an impact on plaintiff's ability to proceed in state court.

### C. Conclusion

■ The Court concludes that this action does not involve exceptional circumstances such that the Court should refrain from exercising its subject matter jurisdiction and abstain from proceeding with the action. This action involves parties and subject matter that, while similar to the State Court Action, are not identical. Additionally, the considerations that guide a decision on whether to abstain under *Colorado River*, on balance, counsel against

abstaining from this action asserting claims under § 1983 and federal law. Accordingly, defendants' motion for abstention is denied.

## III. MOTION FOR PRELIMINARY INJUNCTION

### A. Applicable Legal Standard

■ A party seeking to obtain a preliminary injunction must normally satisfy a two-prong test: it must (i) establish that it will suffer irreparable harm in the absence of an injunction; and (ii) demonstrate either (a) "likelihood of success on the merits" or (b) "sufficiently serious questions going to the merits to make them a fair ground of litigation and a balance of hardships tipping decidedly in its favor." *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996). Where, as here, the moving party seeks to enjoin "government action taken in the public interest," and seeks a mandatory injunction, one that will "alter the status quo by commanding a positive act", *Jolly*, 76 F.3d at 473–74, the second prong of the standard is more rigorous; plaintiff must demonstrate "a clear and substantial likelihood of prevailing on the merits". *See id.*

■ The Court notes at the outset that a district court's issuance of an injunction is reviewed for abuse of discretion: applying "incorrect legal standards" or relying on "clearly erroneous findings of fact". *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir.1999)(collecting cases).

### B. Irreparable Harm

In order to satisfy the first prong for the issuance of a preliminary injunction, plaintiff must demonstrate that it "would be irreparably harmed if the injunction were not granted." *NAACP v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir.1995). "A moving party must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." *Id.; see also Tucker*

*Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989).

"Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction." *Bery v. City of New York*, 97 F.3d 689, 691 (2d Cir.1996)(involving artists challenging city law requiring vendors' licenses in order to sell visual art in public places)(citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). Numerous cases hold that threatened sanctions, such as a threat of dismissal from one's employment, in retaliation for activities protected by the First Amendment constitutes irreparable harm. *See, e.g., Sperry Int'l Trade, Inc. v. Government of Israel*, 670 F.2d 8, 11 (2d Cir.1982)(involving challenge by employees of Sheriff's department who contended that employees were threatened with dismissal because of their lack of affiliation with Democratic party).

Here, absent an injunction, plaintiff will be denied HUD funding as a result of defendants' downgrading of plaintiff's projects. If, as plaintiff contends, defendants' reranking was in retaliation for plaintiff's First Amendment activities, plaintiff's injuries are not "remote" or "speculative" injury, but rather "direct and purposeful penalization". *See Brooklyn Institute of Arts and Sciences v. City of New York*, 64 F.Supp.2d 184, 198 (E.D.N.Y.1999)(Gershon, J.)(finding alleged First Amendment retaliation to be irreparable injury when, *inter alia*, City had already cut off appropriated funding to plaintiff, even though plaintiff had neither shown that withholding funding had prevented it from operating specific exhibit, nor shown that withholding funding would force imminent closing of entire Museum).

Plaintiff, however, has not shown that the threatened injury is substantially likely to occur absent the injunction unless it can establish a substantial likelihood of success on the merits of its First Amendment claim. Because the Court concludes, in

section II.C infra that plaintiff has shown that its First Amendment claim is likely to succeed, plaintiff has established irreparable injury.[7] *See Beal v. Stern,* 184 F.3d 117, 123–24 (2d Cir.1999)(emphasis added), *quoted in Brooklyn Institute,* 64 F.Supp.2d at 197 ("The conclusion that freedom of expression is threatened, however, depends on the merits of the action"); *Hsu v. Roslyn Union Free School Dist. No. 3,* 85 F.3d 839, 853 (2d Cir.1996).

■ Defendants allege that the two actions Housing Works filed against the City in late September are evidence that plaintiff's speech has not been chilled. *See U.S. ex. rel. Housing Works, Inc. v. City of New York,* 98 Civ. 23228 (filed 9/13/99); *Wright v. Giuliani,* 99 Civ. 10091 (filed 9/9/99). This evidence does not demonstrate, however, that Housing Works' speech has not been, nor will be, chilled. *See Brooklyn Institute,* 64 F.Supp.2d at 198 ("That the Museum has so far stood up to these efforts does not deprive it of the right to injunctive relief."). The fact that a party has continued to exercise its First Amendment rights to some extent, does not mean that it is not being chilled into engaging in less speech than it otherwise would have. *Cf. Elrod,* 427 U.S. at 373, 96 S.Ct. 2673 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). The Court finds that plaintiff has established irreparable injury absent an injunction.

### C. Plaintiff's Likelihood of Success on its First Amendment Retaliation Claim

Plaintiff alleges that under 42 U.S.C. § 1983, defendants violated both its free speech and equal protection guarantees under the First and Fourteenth Amend-

ments of the U.S. Constitution.[8] Because we find that plaintiff has demonstrated a likelihood of success on the merits of its First Amendment claim, we do not reach the equal protection claim.

Plaintiff brings this action under 42 U.S.C. § 1983, arguing that defendants have deprived it of rights guaranteed to it by the First and Fourteenth Amendment under color of state law when defendants downgraded Housing Works' two projects allegedly in retaliation for plaintiff's publicly voiced criticisms of the Giuliani Administration's treatment of PWAs.

> [T]his Court has made clear that even though a person has *no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely.* It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests–especially, his interest in freedom of speech.... This would allow the government to "produce a result which [it] could not command directly".

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (citation omitted) (emphasis added) (holding that even though plaintiff had no contractual or tenure right to renewed contract, alleged retaliatory non-renewal of contract could be basis for alleging First Amendment violation); *see also Cuban Museum of Arts and Culture, Inc. v. City of Miami,* 766 F.Supp. 1121, 1125 (S.D.Fla.1991) (holding that even though Cuban Museum lacked contractual right to renewal of lease from City of Miami, alleged retaliatory non-renewal of lease could be basis for First Amendment retaliation claim). Simi-

---

**7.** Plaintiff asserts another two injuries that it claims are irreparable: (i)Housing Works' two supportive housing projects will have to be closed; and (ii) Housing Works' clients will lose Housing Works' services. Because the Court finds that plaintiff will suffer irreparable injury because its speech will be chilled, the Court need not consider the other two proffered grounds for injury.

**8.** Plaintiff does not assert that the other claims set forth in its complaint meet the standard for a preliminary injunction.

larly, even though plaintiff has no right to the renewal of its multi-million dollar HUD grant, defendants may not deny this renewal in retaliation for plaintiff's exercising its right to free speech.

■ There is a two step process for establishing a First Amendment retaliation claim under section 1983. A plaintiff must show: (i) "that [its] conduct was protected by the First Amendment," and (ii) "that defendants' conduct was motivated by or substantially caused by [plaintiff's] exercise of free speech". *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir.1994) (citations omitted); *see also Board of County Commissioners, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 684, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996); *Mount Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 284–85, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). However, defendants may avoid liability if they are able to establish, as an affirmative defense, that "in light of their knowledge, perceptions, and policies at the time of the termination", they would have downgraded the rank of plaintiff's two projects even in the absence of plaintiff's protected speech. *Umbehr*, 518 U.S. at 684, 116 S.Ct. 2342; *see also Adler v. Pataki*, 185 F.3d 35, 47 (2d Cir.1999).

### 1. Conduct protected by the First Amendment

■ First, plaintiff has established that its conduct was protected by the First Amendment, because, under these circumstances, speech is protected if it is a matter of public concern. *See Umbehr*, 518 U.S. at 685, 116 S.Ct. 2342; *Ezekwo v. New York City Health and Hospitals Corp.*, 940 F.2d 775, 781 (2d Cir.1991) (citing *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("[A]n inquiry to be determined in light of the content, form and context of a statement.")). Plaintiff: (i) has engaged in a series of widely-publicized demonstrations and protests against the Giuliani Administration's policies, and (ii) has prosecuted

several lawsuits against the Giuliani Administration allegedly seeking to improve the condition of PWAs.

### 2. Retaliatory Motive

Second, plaintiff has established a clear and substantial likelihood that it will be able to demonstrate at trial that plaintiff's exercise of its free speech substantially caused defendants' act of reranking Housing Works' applications.

The Court finds that plaintiff's evidence is sufficient because it has shown well-documented circumstantial evidence of a retaliatory motive. *See, e.g., Fernandez v. City of Poughkeepsie*, 67 F.Supp.2d 222, 227 (S.D.N.Y.1999) ("[I]t is sufficient to allege facts from which a retaliatory intent on the part of the defendant reasonably may be inferred."); *see also Morris v. Lindau*, 196 F.3d 102 (2d Cir.1999) ("Causation can be established ... indirectly by means of circumstantial evidence ...."); *cf. Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996) (stating that circumstantial evidence is often the only means available to prove retaliation claims); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir.1989) ("employers are rarely so cooperative as to include a notation ... that their actions are motivated by factors expressly forbidden by law."); *Kane v. Krebser*, 44 F.Supp.2d 542, 547 (S.D.N.Y.1999) ("Rarely can plaintiffs obtain documents or testimony wherein an employer specifically proclaims his or her desire to retaliate against an employer for engaging in protected speech.").

#### a. Proximity in time

■ Circumstantial evidence of retaliation may be found when defendants are aware that plaintiff has engaged in protected speech and defendants' challenged behavior closely follows that protected speech. *See Davis v. State of California Department of Corrections*, Civ. No. S–93–1307DFL GGH, 1996 WL 271001,*6 (E.D.Cal. Feb. 23, 1996) (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.

1987)) ("A showing of causal link is frequently inferred from two elements of circumstantial evidence: first, that defendant knew of the plaintiff's protected activity at the time the adverse action was taken, and second, there was closeness in time between the protected action and the allegedly retaliatory employment decision."); *Holava–Brown v. General Electric Co.*, No. 98–9661, 1999 WL 642966,*3 (2d Cir. Aug. 20, 1999) ("Circumstantial evidence commonly takes the form" of temporal proximity and "if the time that elapses between the protected activity and the adverse action is short enough, nothing more is necessary to satisfy the causation prong."); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995) (concluding in retaliation claim that though "we examine prisoners' claims of retaliation with skepticism . . . such temporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation."); *DeCintio v. Westchester Cty. Medical Center*, 821 F.2d 111, 115 (2d Cir.1987) ("Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment."); *Wells v. Wade*, No. 96 Civ. 1627(JES), 1999 WL 42171, at *4 (S.D.N.Y. Jan. 28, 1999) (same).

Here, plaintiff has established that, at the time the reranking was ordered, defendants knew of plaintiff's protected speech. Plaintiff's protected activity includes numerous suits filed against the City and appealed, in the years 1995, 1996, 1997, 1998, and 1999. Plaintiff's protected activity also includes repeated demonstrations, *inter alia*, the 1994 protests criticizing Reiter's role in the proposed abolition of DAS (King Decl. ¶ 19); the 1995 "This City is Ours" rush-hour blockage of tunnels (King Decl. ¶ 59 n. 10); the 1997 protest wherein Housing Works' activists allegedly "chained themselves to desks" at Mayor Giuliani's campaign headquarters (King Decl. ¶ 47); the July 1998 protest on City Hall steps against the City's alleged violations of Local Law 49, wherein protesters waived placards of Mayor Giul-

iani stamped in blood red "AIDS Criminal" (King Decl. ¶ 58); the November 1998 vigil at City Hall to "Tell the Mayor: People with AIDS are Dying" (King Decl. ¶ 16); the December 1998 commemoration of World AIDS Day, staged on the steps of City Hall (King Decl. ¶ 57). Plaintiff's extensive criticism of the Giuliani Administration's treatment of PWAs received lavish media coverage, including clips on evening news and an extensive collection of newspaper articles. (Exs. A, O att. to King Decl.; Def. Ex. 30.) The employees at DHS clearly were aware of the nature and tenor of Housing Works' activities. (Wiviott tr.; Sawyer tr.; Oesterreich tr.)

Defendants were also aware, at the time they reranked plaintiff, of the mayor's hostility toward Housing Works, as depicted by the media. Given Housing Works' barrage of the Giuliani Administration, it is not surprising that in November 1998, for example, Mayor Giuliani left a press conference when asked about Housing Works, grimacing and throwing up his hands in disgust, an event filmed and broadcast on the nightly news. (King Decl. ¶¶ 16, 60.) The administration also instituted security measures at a Housing Works' demonstration of late 1998 that included snipers on the roof of City Hall and chain-link fences. (Ex. A att. to King Decl.; King Decl. ¶¶ 16, 60.) The *New York Times* reported that Mayor Giuliani viewed Housing Works as having painted a "very very false picture . . . for the purpose of getting attention for themselves." (Ex. O att. to King Decl.)

Defendants' knowledge of plaintiff's barrage of demonstrations and law suits of the last five years, including the year preceding defendants' April 1999 decision challenged in this litigation, was temporally proximate to that decision, even if that knowledge accrued incrementally, as each event occurred. *See, e.g., Holava–Brown*, 1999 WL 642966,*4 (holding that all of plaintiff's speech must be considered such that speech stretching over a period of time can be temporally proximate to defen-

dant's challenged act: "Where an employee has engaged in continuing protected activity, all of that activity should be taken into account in analyzing its causal relationship to the [challenged decision]."). Even though a number of months may have elapsed between plaintiff's last demonstration and defendants' reranking of Housing Works' projects in April 1999, plaintiff continued actively litigating against the City even during that time.[9] The proximity in time between plaintiff's protected speech and defendant's conduct constitutes indirect evidence that plaintiff's rankings were tainted by an improper motive.

In *Marchese v. Goldsmith*, Nos. Civ. A. 92–6952, Civ. A. 92–6954, 1994 WL 263301 (E.D.Penn. Jun. 13, 1994), *affd*, 47 F.3d 1161 (3d Cir.1995), an employee in a city sewage treatment plant claimed that his discharge was in retaliation for whistleblowing concerning sample tampering during the city's attempt to remedy EPA violations. Defendant, the mayor, had inherited the "escalating" problem from the previous administration. *Id.* at *2. The court found that the mayor knew that Marchese had raised the issue of sample-tampering and treated him as a "troublemaker". *Id.* at *4. After several months, while the mayor was attempting to remedy the problem, Marchese approached the mayor's assistant director of operations for public works, again relating his suspicions of sample tampering by the clean-up crew. The official "threw his hands up" and exclaimed "J–C ---! I've got to start telling the Mayor we're going to start another federal investigation?" *Id.* at *4. Four days later, the mayor put Marchese on leave, claiming that curing the EPA violations had revealed that Marchese's incompetence had caused the violations. The Court found retaliatory intent in part because the defendant was aware of the whistleblower and because the termination

was temporally proximate to the last of a series of violation allegations that plaintiff had lodged with the mayor --- or rather with his subordinate, which the court found much the same thing. There, as here, plaintiff sought to raise awareness concerning alleged problems with an administration's policies, and the mayor and his administration were well aware that plaintiff engaged in that criticism. There, as here, plaintiff has criticized the mayor a number of times, and defendant's reranking of plaintiff was temporally proximate to the last of plaintiff's speech activities. There, as here, substantial evidence of retaliatory intent is present.

#### b. Disparate treatment

■ Evidence that defendants acted toward plaintiff disparately from the manner in which defendants acted toward others may serve as circumstantial evidence of retaliation. *See, e.g., Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2d Cir.1990) ("The causal connection ... can be established indirectly with circumstantial evidence, for example, ... through evidence of disparate treatment of employees who engaged in similar conduct...."); *DeCintio*, 821 F.2d at 115 (same); *Grant v. Bethlehem Steel*, 622 F.2d 43, 46 (2d Cir. 1980) (same); *Green v. City of Montgomery*, 792 F.Supp. 1238, 1254 (N.D.Ala.1992) ("Types of circumstantial evidence commonly encountered which can support an inference that retaliatory motive played some part" include "departures from the normal procedural sequence" and "deviat[ing] from [defendants'] own written procedures to carry out adverse action against the protesting employee").

#### (i) DHS disparately treated projects that were being rescored

An example of aberrant behavior by defendants in this case that suggests retalia-

---

9. Even were there not a sufficiently short interval, it would be difficult for defendants to credibly argue that the passage of several months could cleanse some five years of plaintiff's high profile criticism and the concomitant apathy engendered among defendants.

tory motivation is the rescoring of Housing Works' pre-applications that was executed without interaction with plaintiff and without explanation on the score sheet itself. Sawyer scored pre-applications before she ranked them, and her scores for all the projects matched proportionately to the rankings she awarded. (Sawyer Aff. ¶¶ 8, 10.) When Wiviott told her to change the rank of both of Housing Works' projects because of the non-responsibility determination, Sawyer rescored Housing Works' projects to match the new score. (Sawyer Aff. ¶ 7; King Decl. ¶ 73.)

Sawyer had scored and rescored other pre-applications that had triggered fiscal concerns. In one instance, she had initially awarded a program zero points for failing to provide certain funding information. (Sawyer tr.) Sawyer communicated with representatives of that program, held a conference, helped construct a solution, and then rescored that program when the solution was implemented, awarding the full 15 points. (Sawyer tr.) Because the maximum score was 90, this represented a significant score improvement, and concomitant rank upgrade. (Sawyer Aff. ¶ 6.) On the second score sheet, Sawyer also delineated exactly what had generated the rescoring. (King Decl. 10; Ex. R att. to King Decl; Pl.Ex. EE.; Sawyer tr.)

When, however, Sawyer rescored Housing Works on the basis of fiscal concerns that had been raised allegedly by the Vendex record, she did not communicate with Housing Works about the problem, she did not hold a conference, she did not help construct a solution, and she did not explain on the score sheet why she was changing the score. (Sawyer tr.) Instead, Sawyer simply struck off points here and there, to bring the score down enough to match the ranking that Wiviott had predetermined. (Sawyer tr.) Sawyer explained that she did not insert any explanation at all for the rescoring because "DHS scoring forms were not designed to reflect information obtained from the Vendex database", even though the form was letter-sized, double-spaced, and filled out by hand, and Sawyer admitted that there would have been ample room to do so. (Sawyer Aff. ¶ 8, 11; Sawyer tr.) When Sawyer was asked why she treated the two Housing Works' pre-applications differently than the other pre-applications, her reply was succinct: "My sense was that it was non-negotiable," she said. (Sawyer tr.)

It is clear, however, that had Sawyer wished to discuss the fiscal problems with Housing Works· constructively, not only she, but neither of the other DHS defendants would have been able to do so; none of them knew what these fiscal problems were. Oesterreich testified that all the information that he had was the Vendex notation that HRA had made a determination of non-responsibility. Wiviott testified that in addition to the non-responsibility determination, she "had this vague sort of notion" that the sum of $600,000 was at issue in some way, but beyond that knew no more. (Wiviott tr.) Sawyer knew nothing beyond what Wiviott informed her. (Sawyer tr.)

### (ii) HUD's concerns as to disparity in treatment

This disparity in treatment did not go unnoticed by HUD. On July 8, 1999, following receipt of the DHS ranking, HUD wrote to the mayor stating that "after undertak[ing] a review of the situation ... significant evidence exists to suggest" that City staff took "unilateral action to change priorities of at least two proposed projects both of *which were proposed by agencies which had a history of adversarial relationships with the City.*" (Ex. U att. to King Decl.) (emphasis added). The HUD letter stated that a "fair and open process" was required and that HUD had "very serious concerns" that "projects which were either prioritized highly in the planning process or met the criteria for high prioritization were removed from the priority list altogether or *ranked much lower than other similar groups as result of actions taken by City staff.*" (Ex. U att. to

King Decl.) (emphasis added). Although the HUD letter did not refer specifically to Housing Works, the Court infers that HUD was likely referring to the City's re-rankings that are the subject of this proceeding, since they are the only ones that have been brought to the attention of the Court.

Defendants submit that HUD nowhere requires that ranks be assigned in accordance with score sheets, and that, consequently, defendants were not bound to follow that procedure. (King Decl. ¶ 75; Sawyer Aff. ¶ 7; Wiviott Decl. ¶ 11.) The issue, however, is not whether the Coalition might have established a different procedure and different criteria for ranking, but whether DHS uniformly applied the criteria that the Coalition, in the form of the Steering Committee, had ultimately chosen. The lack of uniformity evinced by rejecting use of the numeric scores reflecting Coalition criteria in the scoring of Housing Works' projects is emphasized by the fact: (i) that the Steering Committee had established four categories of priority programs: renewals, projects benefiting clients with AIDS, projects benefiting mentally ill persons, and projects benefiting the chemically dependent, and that both Housing Works' projects fit all four criteria, (Wiviott Decl. ¶ 28); and (ii) that Sawyer had found on visiting the sites that both of Housing Works' projects were "excellent" and "high quality" and "met or exceeded HUD goals", and had consequently initially scored Housing Works in a manner that would have translated into a rank of 30th and 33rd respectively on Housing Works' two projects. (Sawyer Aff. ¶ 6; King Decl. ¶ 70; Sawyer tr.)

The fact that defendants treated plaintiff's pre-applications differently than it had treated other applications, supplies circumstantial evidence that defendant's behavior was retaliatory.

### c. Pattern of antagonism

■ Evidence of a "pattern of antagonism" or of prior retaliatory conduct may serve as circumstantial evidence of retalia-

tion. *See Rodriguez v. Torres*, 60 F.Supp.2d 334, 341 (D.N.J.1999) (finding that plaintiff had circumstantially established retaliatory intent, in part because there was "proof of a 'pattern of antagonism' toward plaintiff during the relevant time period"); *Farrell v. Planters Lifesavers Co.*, 22 F.Supp.2d 372, 393 (D.N.J.1998) (noting that plaintiff offered no evidence to suggest pattern of antagonism that could give rise to inference of retaliation); *see also Morris v. Washington Metropolitan Area Transit Authority*, 702 F.2d 1037, 1046 (D.C.Cir.1983) ("[Defendant's] response to criticism on other subjects, if proved, was persuasive of its motivation in firing [plaintiff] for the reasons [plaintiff] claims."); *Marchese*, 1994 WL 263301 *3–4 (finding retaliatory intent in mayor's termination of plaintiff's employment, in part because mayor had singled out plaintiff, a whistle-blower, fostering long standing friction between plaintiff and city employee, and because later, right before plaintiff's termination, mayor's director of operations had "thrown up his hands" when plaintiff wished the director to tell mayor of new EPA violations allegations); *Green*, 792 F.Supp. at 1254 ("types of circumstantial evidence commonly encountered which can support an inference that retaliatory motive played some part" include "the historical background of the decision ... particularly if it reveals a series of official actions taken for invidious purposes ... the specific sequence of events leading up to the challenged decision");

Here, not surprisingly given the nature and aggressiveness of plaintiff's protest activities, there is a clear showing of a pattern of antagonism by the Giuliani Administration towards plaintiff.

### (i) Statements made by senior Giuliani Administration officials in the circumstances surrounding HRA's refusal to renew contracts

An example of the City's overt hostility towards Housing Works is further evident from statements made in the circum-

stances surrounding HRA's non-renewal of City contracts related to Housing Works' ongoing projects. In March 1997, King and Brier attended a meeting between Housing Works and HRA concerning new contracts and contract renewals; they allege that HRA's then-Commissioner Barrios–Paoli: (i) threatened Housing Works with retaliatory treatment if it continued to "cause trouble" by advocating on behalf of PWAs, (ii) asked Housing Works why it was so hostile to the Giuliani Administration, and (iii) advised that Housing Works could not expect favorable treatment with Housing Works' attitude. (King Decl. ¶¶ 1, 32, 33; Brier Aff. ¶¶ 1–4.) Defendants dispute that Barrios–Paoli was threatening King and Brier. What is undisputed is: (i) that, out of character with plaintiff's demonstrated penchant for aggressive advocacy, plaintiff did not protest or demonstrate against what it perceived as the City's unfairness in not entering into certain contracts with Housing Works, from that point until October 22, 1997, (Brier Aff. ¶¶ 6–7); and (ii) that the same day the protest was held, October, 22, 1997, HRA issued a press release stating that it would not renew Housing Works' contracts totaling approximately $ 4.5 million and would no longer enter into contracts with Housing Works relating to its ongoing projects, (King Decl. ¶¶ 37, 46). Given that HRA had been considering whether to renew plaintiff's contracts for more than six months, HRA's timing of the release of its decision to coincide with the date of plaintiff's protest supports an inference that there was animosity harbored by HRA towards plaintiff's advocacy tactics.

This inference is further supported by a reference in the notes of Barkan, Deputy Mayor Mastros' then-Chief of Staff, in September 1997, approximately one month prior to HRA's press release referred to above. Barkan took notes on a discussion that she had with a City employee (whose name she cannot now recall) concerning Housing Works, the first line of which reads: "Housing Works (*Fran Hates them* )", referring to Fran Reiter, and be-

low that: "Act-up" and "AIDS advocacy". (King Decl. ¶ 40 (emphasis in original); Ex. J att. to King Decl.) Plaintiff notes that it had earlier subjected Reiter to extensive criticism concerning her participation in an aborted attempt by the Giuliani Administration to abolish DAS. (King Decl. ¶ 70.) Defendants submit that Reiter had not acted in the contract dispute. (Bailey State Aff. ¶ 179).

Both Kasman, the City's Chief Procurement Officer, and MOC staffer Weinstein referred in their notes dated October 20, 1997 to a strong rumor that Housing Works would protest at City Hall, with Kasman adding that Mastro "needs a report on all they (HW) did wrong" and that Mastro had told Barrios–Paoli that she "must be prepared to respond on camera tomorrow". (King Decl. ¶ 43, 44; Ex. K at 11; Ex L at 5.) Kasman's notes dated October 21, 1997 bracket news of an imminent protest together with a reference to a meeting with Klasfeld, then on Mastro's staff. (King Decl. ¶ 45; Ex. K at 13.) Mastro's instructions may have been issued in anticipation of media questions following the expected Housing Works protest. Mastro's direction, however, provides additional support for the inference that the press release was deliberately timed because of the Giuliani Administration's ire with the militant advocacy group. *See Green,* 792 F.Supp. at 1254 (holding that defendant's surveillance of plaintiff was basis for retaliatory intent because gathering information on plaintiff suggested seeking of pretext); *cf. Cruz v. Aspin,* No. 93–55468, 1994 WL 497846, *3 (9th Cir. Sept. 9, 1994) (holding that plaintiff established causal link necessary for inference of unlawful retaliation in part because of "unusually close supervision from [his immediate supervisor] and his successor").

### (ii) Mayor's failure to rule on plaintiff's appeal

A pointed example of the mayor's antagonism towards Housing Works is the mayor's treatment of plaintiff's appeal

from HRA's finding of non-responsibility, treatment that is unusual enough to warrant an inference of retaliatory intent on the part of defendants. Under *New York City, N.Y., Rules* § 7–03, Housing Works had the right to appeal the HRA Commissioner's affirmation of HRA's non-responsibility determination. On September 14, 1998, plaintiff timely appealed to the mayor. (King Decl. ¶ 54.) As of this date, November 1999, more than a year later, Housing Works has received no ruling from the mayor on its appeal. (King Decl. ¶ 54.) Mayor Giuliani has failed to rule despite the fact that the law is clear; "a prompt written decision with respect to the merits of the bidder's appeal" is required. *New York City, N.Y., Rules* § 7–03(e)(4) (1998). The Court takes judicial notice that, historically, mayors have handled these appeals expeditiously, due to the grave consequences that a determination of non-responsibility has on the finances and vitality of the beleaguered entity. *See supra* Part III.C.2.b. (analyzing defendant's deviation from normal procedure as basis for retaliatory intent).

The mayor's failure to rule has effectively foreclosed Housing Works from challenging the finding of non-responsibility in court. (King Decl. ¶ 54.) The City submits that the non-responsibility determination can now be deemed denied, but plaintiff is entitled by law to its appeal and should not have to challenge the City in court to do that which the law clearly requires. Putting a small non-profit entity to that burden imposes the risk of depleting plaintiff's slender resources, in order to obtain relief that is not in issue. The mayor's inaction is evidence of his antagonism towards plaintiff, and his willingness to be perceived as having retaliated.

### (iii) Turner's refusal to allow plaintiff to be awarded the state job training contract

A final example of antagonism displayed by the Giuliani Administration concerns HRA's tenacious and ultimately successful bid to have New York State agencies deny Housing Works funding. In late 1998, during an especially concentrated period of plaintiff's successive demonstrations against the Giuliani Administration, *see supra* Part III.C.2.a, Housing Works applied for a "Welfare–to–Work" contract, a contract to provide job training for public assistance recipients with HIV/AIDS, in response to an October 1998 solicitation by the State Department of Labor ("SDOL") and State Department of Health ("SDOH"). (Turner Aff. ¶ 4.) The "Welfare–to–Work" proposals required a written approval by the local social services district, which for Housing Works meant HRA approval. (King Decl. ¶ 86.) HRA added "affirmative approvals" to all proposals submitted to it en route to SDOL, but for three proposals, one of which was Housing Works'. (Turner Aff. ¶ 7; Ex. 6 att. to Bailey Decl.) Those three proposals were awarded merely "form letters of certification". (Turner Aff. ¶ 7; Ex. 6 att. to Bailey Decl.) HRA's certification of Housing Works as a potential service provider was submitted to the State in December 1998. (King Decl. ¶ 86.)

King alleges that in or about February or March 1999, he was informed that Housing Works was the highest ranked bidder. (King Decl. ¶ 87.)

On February 23, 1999, HRA Commissioner Turner sent a letter to the State Commissioner of Labor "withdrawing its 'Certification Form for the State of New York Department of Labor HIV Welfare–to–Work Request for Proposals'" with respect to the proposals submitted by three agencies, including Housing Works. (Ex. 6 att. King Decl., letter from Turner to SDOL dated Feb. 23, 1999). Turner's explanation for the withdrawal was that the certification had been provided with a view to "allow[ing] the selection committee as broad a review as possible", and that he had thought HRA would later have another chance to comment, this time on the proposals already deemed reviewable, but had been apprized in January that HRA would not be on the final selection commit-

tee. (Ex. 6 att. King Decl., letter from Tuner to SDOL dated Feb. 23, 1999). Housing Works disputes this rationale for the withdrawal, asserting that the letter was sent because Turner had been informed that Housing Works was going to be awarded the contract. (King Decl. ¶ 88.)

Turner's letter contained a conclusive assertion that all three proposals were "non-responsive ... to the goals of HRA's Division of Aids Services and Income Support regarding private sector job development, preparation and placement." (Ex. 6 att. Bailey Decl., Letter of Turner, Feb 23, 1999). The letter also detailed Housing Works' fiscal history: the March 17, 1998 DOI report, the September 4, 1998 nonresponsibility determination, and the November 18, 1998 Appellate Division decision in *Housing Works v. City of New York*. (Ex. 6 att. Bailey Decl., Letter of Turner, Feb 23, 1999). The letter did not detail the fiscal history of the other two programs. (Ex. 6 att. Bailey Decl., Letter of Turner, Feb 23, 1999).

Turner not only sent a letter to SDOL, he met, thereafter, with Karen Papendrea of SDOL and Humberto Cruz ("Cruz") of SDOH, allegedly in order "to clarify the reasons for HRA's de-certification of Housing Works as a potential vendor." (Turner Aff. ¶¶ 6, 7.) Housing Works submits that the Turner meeting was called in order to prevent Housing Works from being awarded the job contract. (King Decl. ¶ 89.) Turner reasserted that it would be irresponsible for HRA to approve distribution of funds to Housing Works in light of the audits and the fact that HRA had not recovered the misallocated funds, especially since City funds would provide significant funding for the state job training contract. (Turner Aff. ¶¶ 6, 7; King Decl. ¶ 89.) Further, Turner told SDOL that if Housing Works received SDOL funds, HRA would: (i) neither refer clients to Housing Works' program (ii) nor approve Housing Works' billing for services rendered to clients who approached it on their own, effectively precluding Housing Works' from receiving the funds for the job training were Housing Works awarded the state contract. (Turner Aff. ¶ 8; King Decl. ¶ 92; Cruz trans.)

Moreover, in order to alleviate any of HRA's concerns as to Housing Works' financial responsibility, at the meeting Cruz had suggested that a third nonprofit organization would handle all financial and accounting aspects of the contract. (King Decl. ¶¶ 89, 90. Cruz tr.) Cruz explained why the solution was suggested. He testified that in his experience, social service non-profit organizations typically have accounting and record-keeping problems, not because the organizations embezzle funds but because the grant-based nature of the funding causes them to rechannel grant money to tide over projects whose grant money is dwindling. (Cruz tr.) Cruz further explained that because Housing Works is an effective program and serves a particularly needy and neglected part of the homeless community, the State tries to help them to address their accounting and record-keeping problems. Finally, Cruz pointed out that Housing Works' had successfully come through other fiscal crises with State assistance and that, consequently, the State proposed the plan to Turner. (Cruz tr.) Turner rejected the proposal. (King Decl. ¶¶ 89, 90. Cruz tr.)

Housing Works was not awarded the state job training contract. (Cruz tr.)

Turner's unreasonable refusal to adopt even the State-suggested compromise contributes to a picture of antagonism towards plaintiff, an example of the animosity the Giuliani Administration harbored towards the militant advocacy group.

### d. · Conclusion

 Plaintiff has circumstantially established retaliatory intent based on defendants' awareness of plaintiff's protected activity, the temporal proximity of the challenged action to that activity, defendant's disparate treatment of plaintiff's

pre-applications, and the pattern of antagonism toward plaintiff.

The Court acknowledges that any mayoral administration might reasonably resent activities such as those engaged in, particularly the militant kind seemingly favored by plaintiff. Plaintiff's right to continue to express that criticism, however, is protected by the First Amendment. *See Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) ("[A] function of free speech under our system of Government is to invite dispute. It may indeed best serve its purpose when it induces ... dissatisfaction with conditions as they are or even stirs people to anger."); *see also The New York Times Co. v. Sullivan*, 376 U.S. 254, 270–73, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (discussing parameters of free speech "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.... Criticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations.").

### 3. Affirmative defense

■ Defendants have not shown that they will be able to establish at trial that they would have downgraded plaintiff's projects even in the absence of plaintiff's protected speech. Defendants claim that they reranked plaintiff because they had no wish to recommend a financially irresponsible candidate for funding, but the Court finds this proffered motivation to be pretextual. The alleged non-responsibility finding relates to matter such as mis-applying funds to projects, failing to maintain proper records, and having been derelict in reporting. These are serious matters, but ones that both the State and Federal governments have recognized as not uncommon when dealing with under-funded and inadequately financed not-for-profit entities serving the poor. The State and Federal governments have clearly expressed the view that Housing Works serves an important function and are prepared to deal with them even given this history. Indeed, even the City's DHS has acknowledged the excellent performance of Housing Works. The City's proffer of the alleged Vendex non-responsibility report as its sole basis for the reranking notwithstanding its admission that it never investigated whether all of those entitles that it ranked above Housing Works had similar reports nor inquired as to the basis of such report, coupled with its refusal to process the appeal to which Housing Works was entitled, suggests that, in this case, the non-responsibility basis for its actions is pretextual.

### a. Differential treatment

In *Cuban Museum*, 766 F.Supp. at 1127, the court rejected as pretextual the City of Miami's claim that the reason it had denied a lease-renewal to plaintiff was not because plaintiff had exhibited controversial art but because the City was investigating allegations of plaintiff's self-dealing directors. The court reasoned that the City's investigation had been disparately implemented and, significantly, did not investigate "directors other than those who had been linked with the controversial art." *See id.* (finding that defendant "never exhibited real concern over possible self-dealing and auction profits" in connection with the other, purportedly self-dealing directors). Another instance, in that case, where defendant's selective treatment of those who had engaged in protected speech supported the court's finding of pretext, was defendant's selective implementation of a Miami city ordinance governing renewals. *Id.* at 1128 ("[T]he manner in which the City manages city-owned property reveals that ... *The City has regularly allowed others* to use city-owned property without formal leases ....") (emphasis added); *see also Sumner*, 899 F.2d at 209 (rejecting as pretextual defendant's

claim that basis for disciplining plaintiff was infraction of "sitting on a carrier case", in part because fellow Postal Service employee testified that he had never heard of anyone being disciplined for that infraction in 35 years of service).

In this instance, the Court concludes that defendants' assertion of the critical importance of the non-responsibility determination is pretextual, based circumstantially on, among other factors referred to above, the way the Vendex search had been selectively implemented among applicants for HUD grants. Oesterreich testified that it was the non-responsibility determination, that induced him to instruct Wiviott, who in turn directed Sawyer, to rerank plaintiff below the $54 million mark. (Oesterreich Aff. ¶ 8; Sawyer Aff. ¶ 7; King Decl ¶ 71.) However, the individual defendants admit that they knew little, if anything, of the details underlying that non-responsibility determination or concerning anything else regarding plaintiff's finances. Oesterreich conceded that all he knew of plaintiff's financial problems was the non-responsibility determination. (Oesterreich ¶ 10.) Wiviott testified that in addition to the non-responsibility determination, she "had this vague sort of notion" that the sum of $600,000 was at issue in some way, but beyond that knew no more. (Wiviott tr.) Sawyer knew nothing beyond what Wiviott informed her. (Sawyer tr.) Consequently, in claiming that plaintiff's history of financial irregularity was what motivated the downgrading, defendants necessarily rely solely on the Vendex notation of non-responsibility.

Yet it is far from clear that either Vendex records or determinations of non-responsibility played so central a role regarding the process of ranking any pre-application other than Housing Works' pre-application. *First*, in previous years, DHS had not found it necessary to consult the Vendex database at all in determining the rankings of projects. (Oesterreich Aff. ¶ 6.) *Second*, when Oesterreich instituted the use of Vendex searches on his appointment as Commissioner in March 1999, he instructed Wiviott to run a search on all applicants, *but she ultimately searched only 57 out of 95*. (King Decl. ¶ 77.) Regardless of the reason for the partial search, "at least some" of the remaining programs applying might also have been determined to be non-responsible, as Wiviott conceded. (Wiviott tr.) Wiviott submitted that some of the applicants whose Vendex records had not been examined had been forwarded to DHS by agencies that had "probably done a Vendex search", but admitted that she did not know that to be the case. (Wiviott tr.) This lack of knowledge is inconsistent with defendants' assertion that these determinations were decisive in establishing which applicants were to be recommended to HUD. *Third,* while Oesterreich asserted that the non-responsibility determination was pivotal to the reranking of plaintiff, Wiviott testified that the information was unimportant, that it "merely affirmed what I already knew" what she already "generally knew about it, and I had a very strong sense that I was right about it, and, you know, I didn't necessarily investigate or look into it, but I had a fairly strong sense" based on "what I had read, and probably it had been discussed." (Wiviott tr.)

Defendants' emphatic reliance on the Vendex recorded non-responsibility determination was not uniform, but apparently of paramount importance only insofar as the bidder involved was Housing Works. This differential treatment circumstantially supports the conclusion that defendants' proffered motive was pretextual.

Defendants assert both: (i) that in 1995 and 1996 they recommended plaintiff for its original HUD grants though plaintiff had already begun protesting and litigating and defendants were already aware of this, and (ii) that the only difference between the 1995 and 1996 applications was the fact that there had been a non-responsibility determination in the interim. That difference, defendants submit, accounts for the reranking, and that if defendants had

sought to retaliate, they would have done so in 1995 and 1996.

This argument is unpersuasive on two counts. *First,* the fact that defendants did not choose to retaliate in determining the projects recommended for the 1995 and 1996 HUD grants, would not, in any case, foreclose the possibility that defendants are retaliating here, especially in light of the fact that three extra years of demonstrations and litigation may have substantially increased defendants' inclination to retaliate. *See, e.g., Marchese,* 1994 WL 263301,*3–*4, (noting that one instance of protected speech might be the "last straw" even though protected speech might have been ongoing for period of time). In 1995, after all, plaintiff had not yet, *inter alia,* paraded placards with the mayor's face stamped "AIDS Criminal" in blood-red ink, chained themselves to desks in the mayor's headquarters, litigated a succession of cases in state and federal trial and appellate courts concerning the City's treatment of PWAs, or released what the New York Times called a "nightmarish" report, that the Giuliani Administration had kept confidential, revealing HRA's treatment of PWAs.

*Second,* defendants are incorrect in asserting that the only relevant change between 1995 and 1999 was plaintiff's non-responsibility determination. Another change was the Vendex database search. It is undisputed that no Vendex search was administered by DHS in the process of ranking programs until Oesterreich intervened in April 1999, and, at that, after the original ranking for 1999 had already been completed. (Oesterreich Aff. ¶ 6.) It follows that in the 1995, 1996, 1997, 1998 rankings (and even in the 1999 ranking until April 15, 1999 when Oesterreich ordered the Vendex check that resulted in a reranking) any number of applicants—including Housing Works—might have had non-responsibility determinations on their records and defendants would have had no idea that this was the case. Therefore, the fact that defendants recommended plaintiff for HUD funding in 1995 and 1996, years prior to plaintiff's non-responsibility determination, is not proof that, had there been a non-responsibility determination noted on plaintiff's Vendex in 1995, DHS would have withheld its recommendation in the same manner that DHS has done in 1999. Contrary to defendants' assertion, 1995 is not an appropriate benchmark against which to measure the downgrading of plaintiff in 1999. Indeed, the record reflects that: (i) from and after 1996, Housing Works had performed its projects at levels describe by the City's witnesses as "excellent" and "high quality" and at levels "exceeding HUD's goals"; (ii) Housing Works had addressed its accounting and reporting problems, and (iii) both the State and Federal governments were prepared to continue to fund Housing Works projects.

**b. Insufficient evidence on the day the challenged decision was made**

Even were defendants' proffered, permissible motive not pretextual, defendants have not offered any evidence that they had actual knowledge of the facts underlying the allegedly permissible motive on the date the challenged decision was made. *See Umbehr,* 518 U.S. at 685, 116 S.Ct. 2342 (stating that defense requires evidence of defendant's knowledge "at the time of the termination"); *Pataki,* 185 F.3d at 47; *Sagendorf–Teal v. County of Rensselaer,* 100 F.3d 270, 274 (2d 1996). When a permissible motive is substantiated by "after-occurring" events, such as (i) plaintiff's *behavior subsequent* to defendant's challenged decision or (ii) *evidence of plaintiff's behavior* that defendant *acquired after* defendant' challenged decision, defendant is still liable. *See, e.g., Sagendorf–Teal,* 100 F.3d at 275 (holding that defendant's liability for First Amendment violation, based on discharging plaintiff for her report criticizing the handling of prison event, was not mitigated by fact that "after-occurring" rule infractions by plaintiff would properly have warranted discharge had the earlier firing not have

already happened); *see id.* (finding no affirmative defense when "some other circumstance later occurs or later comes to the employer's attention").

The non-responsibility determination on a bidder's vendex record, under the PPB rules, cannot be relied upon by a City agency which has not examined the non-responsibility determination to see if the basis for it would also bar the bidder's bid in the instance under consideration. (Exs. W, V att. to King Decl.) Defendants have asserted that it was the fact of the non-responsibility determination alone that governed their decision, *see supra* Part III. C.3.a. Oesterreich had twenty years experience as a City official in areas relating to the administration of contracts and was familiar with the PBB rules relating to non-responsibility determinations. (Oesterreich Aff. ¶¶ 1,2.)

Oesterreich claims that though DHS did not know the basis for HRA's non-responsibility determination at the time of the reranking and the submission of the applications to HUD, Oesterreich has in the interim examined the basis for the non-responsibility determination and is "confident" that it provides sufficient basis to downgrade plaintiff. (Oesterreich Aff. ¶ 10.) He argues that, retrospectively, his decision to downgrade plaintiff was correct. Under *Umbehr* and its progeny, however, this "after-acquired evidence" is insufficient to afford defendants a viable defense, particularly in light of the views expressed by the State and Federal governments.

The Court concludes that the voluminous facts in the record evince well-documented circumstantial evidence of retaliatory intent, such that plaintiff has established a clear and substantial likelihood of success on the merits at trial.

## IV. CONCLUSION

For the foregoing reasons, plaintiff's motion is GRANTED and defendants' cross-motion is DENIED.

Accordingly, after hearing testimony and argument in this matter and carefully reviewing the evidence submitted,the Court hereby issues the following preliminary injunction:

*1.* City Defendants and HUD, their officers, directors, principals, agents, servants, employees, successors, assigns, and all those acting in concert or participation with them, are hereby ORDERED to re-rank Housing Works' Supportive Housing Program ("SHP") projects consistent with the priorities established by the Way Home Coalition and to do so without downgrading Housing Works' rankings because of defendants' disapproval of Housing Works' criticism of the Giuliani Administration or its advocacy on behalf of persons with HIV or AIDS.

*2.* The Court finds that a re-ranking consistent with these criteria requires that Housing Works' projects be ranked by City defendants and HUD as 30th and 33rd respectively and they are hereby ORDERED to be so ranked.

*3.* City Defendants and HUD are to effectuate the new rankings promptly upon receipt of this ORDER.